FILED
**United States Court of Appeals
Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**August 21, 2020**

Christopher M. Wolpert
**Clerk of Court**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 19-3122 |
| BOGDANA ALEXANDROVNA MOBLEY, a/k/a BOGDANA ALEXANDROVNA OSIPOVA, | |
| Defendant - Appellant. | |

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:17-CR-10142-EFM-1)**
_____

Katryna Lyn Spearman (Joshua Sabert Lowther with her on the briefs), of Lowther Walker LLC, Atlanta, Georgia, for Defendant-Appellant.

Jason W. Hart, Assistant United States Attorney (Stephen R. McAllister, United States Attorney, with him on the briefs), Wichita, Kansas, for Plaintiff-Appellee.
_____

Before **HOLMES**, **SEYMOUR**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

In April 2014, a pregnant Bogdana Alexandrovna Osipova[1] took her young son and daughter to Russia, leaving behind ongoing divorce proceedings in Kansas. By doing so, Osipova deprived Brian Mobley, her soon-to-be ex-husband and the father of her daughter and unborn child, of his joint-custody rights under the Kansas court's temporary custodial order. In Russia, Osipova soon gave birth to a girl and instituted her own divorce proceedings. The Russian court ordered Mobley to pay monthly child support. But by then the Kansas court had already awarded Mobley full custody of their two daughters, and he steadfastly refused Osipova's requests that he pay the Russian court-ordered child support. Eventually, in September 2017, Osipova returned alone to the United States on an ill-fated quest to modify the Kansas order. The FBI promptly arrested Osipova, and she has been incarcerated since.

The government prosecuted Osipova for international parental kidnapping, 18 U.S.C. § 1204, and extortionate interstate communications, 18 U.S.C. § 875(b). A jury convicted Osipova, and the district court sentenced her to three years on her parental-kidnapping conviction (the statutory maximum) and to seven years on each of her extortionate-communications convictions, all to run concurrently.

On appeal, Osipova argues that the federal district judge should have dismissed the indictment and recused himself from her sentencing. We reject these arguments. But Osipova also argues that insufficient evidence supports her § 875(b) convictions and that the court erred by awarding Mobley restitution for attorney's

---

[1] We use the name that Bogdana is currently using, her maiden name, Osipova, rather than her married name, Mobley, to avoid confusion.

fees he incurred attempting to obtain physical custody of their two daughters. On these arguments, Osipova succeeds. Exercising jurisdiction under 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291, we affirm in part and reverse in part. We vacate Osipova's § 875(b) convictions and the restitution order, and remand for resentencing.

## BACKGROUND

Osipova was born in Russia. In 2003, as an adult, she immigrated to New York where she married. This first marriage ended in a divorce in 2008 but produced a son over whom Osipova has full custody. In June 2011, Osipova briefly joined the Air Force Reserve where she met Mobley, her recruiter, and they struck up a romantic relationship. When the Air Force transferred Mobley to Wichita, Kansas, Osipova followed, and they married there in January 2013. That same month, they had a daughter, S.M. But fourteen months later Mobley filed for divorce. The Kansas state court entered a temporary order awarding the parents joint custody over S.M. Under this order, Osipova retained the marital residence at Mobley's expense and Mobley had to pay child support.

But Osipova, then about six months pregnant with their second child, did not want a divorce. According to Mobley, she threatened to return to Russia with S.M. if he did not drop the divorce. Though Mobley was concerned that Osipova would take S.M., he proceeded with the divorce. Then, "[o]n or about April 2, 2014," Osipova, about seven months pregnant, flew to Russia with S.M. and her son. Appellant's App. at 17. About two months later, Osipova gave birth to a girl.

Meanwhile, the Kansas divorce proceedings continued. Two weeks after Osipova left for Russia (so before she gave birth), the Kansas court held a hearing, at which Osipova's counsel was present. The court awarded Mobley full custody of S.M. And in December 2014, after Osipova gave birth, the court granted the divorce, awarded Mobley primary physical and sole legal custody of both girls, and ordered Osipova to return the girls to Mobley's custody. Osipova did not heed this order. By then, a Russian court had already granted her a divorce. And, in the spring of 2015, the Russian court awarded Osipova child support and residential custody of the girls.

Mobley's position in the military prevented him from traveling to Russia, so he tried to establish and maintain a relationship with his daughters via telephone and video calls. In January 2015, he went to Poland to meet Osipova and the girls at the Poland–Russia border, but Osipova showed up alone. After this, Mobley continued to use technology to try to communicate with his daughters—then, a toddler and an infant—and Osipova conditioned the requested communications on his paying the Russian court-ordered child support. But Mobley refused to financially support his daughters unless Osipova returned them to the United States. From November 2016 until her arrest, Osipova denied Mobley direct communication with their daughters.

In September 2017, Osipova left her children in Russia and traveled to Kansas to petition the court for sole legal custody of her daughters. The FBI quickly arrested her on a federal criminal complaint that charged international parental kidnapping, 18 U.S.C. § 1204, for allegedly removing S.M. to and retaining her in Russia. About two weeks later, a federal grand jury issued an indictment charging a single count,

international parental kidnapping. Nine months later, the government filed a five-count superseding indictment (the "indictment") that added four counts of extortionate interstate communications, 18 U.S.C. § 875(b), based on Osipova's allegedly threatening to kidnap S.M. (by continuing to retain her in Russia) while intending both to obstruct Mobley's parental rights and to extort money or things of value.

On the eve of her trial, Osipova moved to dismiss the indictment "because of its lack of specificity." Appellant's App. at 21. The Kansas federal district court denied Osipova's motion, concluding that the indictment met the applicable legal requirements and that Osipova faced no prejudice. So Osipova went to trial, conceding her guilt on the international-parental-kidnapping count but adamantly denying any intent to extort money or things of value in exchange for placing S.M. in Mobley's physical custody in the United States. Osipova also maintained that her communications lacked any "threat to kidnap," an element of the charged extortionate-communication crime. *See* 18 U.S.C. § 875(b). The jury returned guilty verdicts on the international-parental-kidnapping count and on two of the four extortionate-communication counts. Osipova timely moved the court to acquit her of the extortionate-communication convictions or, alternatively, to grant a new trial on those counts (2 and 3), again arguing that her communications lacked any threat to kidnap and implicitly denying any intent to extort. The relevant communications are provided here:

*Count 2* (Skype messages from August 27, 29, and 30, 2015)

    Mobley (August 27): "Can I please Skype with the kids?"

    Osipova: "Can you please pay for the girls' Montessori class?"

    Mobley: "So you are saying that I cannot see my children unless I give you money?"

    Osipova: "So I am saying that we live in Russia. I am 100 percent in compliance with Russian court orders, in which I have full custody and you have visitation rights. You are also ordered to pay one-third of your total income to me as child support for [redacted] and [redacted] every month until they reach their 18th birthday. You are supposed to start making payments in November of 2014. Now is August 2015 and I didn't receive not one payment from you. You missed 10 child support payments by now. And it's no[t] going to go away. It'll just going to built up! You can and should see your children, Brian! You also should start to make child support payments ASAP.

    Mobley (August 29): "Can I Skype with the kids?"

    Osipova: "Yes, you can. You can also transfer the child support to my PayPal."

    Mobley: "When can I talk to them?"

    Osipova: "As soon as you'll start making child support payments."

    Mobley: "And I told you that I am not sending you a dime until you bring them back to the U.S. I am done sending you money."

    Osipova: "And that's the answer to your question then."

    Osipova (August 30): "If you want us back in the U.S. next year, you'll have to provide housing, car, and return all of my furniture, unless you'll decide to buy us a new one, then you can keep mine."[2]

*Count 3* (Skype message from November 21, 2015):

    Osipova: "We are not going to play your games, Brian. I didn't hide kids from you. You know where we live and you can have relationship with them. However, we have only few options that we are going to go. Since your children reside in Russia and Russian family court appointed for the children certain child support, which you are not

---

[2] The record and the government's exhibit contain no context for this message. We cannot tell whether Osipova was responding to something Mobley said, or whether she messaged him this out of the blue after the previous day's conversation. Context is important, and we lack it, as did the jury.

> paying for the whole year now, you can go ahead and start honoring the court order and support our children. The second route is that you can figure out and offer your amount of money as a child support for your two daughters that I raise on my very own without a penny from their father (you) the amount that you will be paying every month to raise our daughters. And I don't care if you save anything and put it in their account for when they grow up. I am talking about child support that you should pay now every month until they reach 18 years old. If we come to an agreement or if you decide to go ahead and honor the Russian child support order we can establish schedule that will be convenient for our daughters and you to Skype on regular basis, maybe meet in Poland every half a year or so, et cetera. And, of course, there is one more route, which is if you decide to neglect our daughters and not be financially involved in theirs upbringing, we will not have any further communication with you. And it will be all your fault. Now I want you to understand that I don't care which route you choose. I don't need a penny from you, but your daughters do."

Appellant's App. at 116:16–117:1, 117:15–18, 117:21–25, 118:15–23, 119:1–5, 119:16–120:19 (as read at trial by Mobley) (internal quotation marks omitted). The district court concluded that, because Osipova sent these messages while retaining S.M. in Russia, a reasonable jury could conclude that Osipova had communicated a "threat to kidnap," which the court had instructed was a threat to "continu[e] to retain [S.M.] outside of the United States with the intent to obstruct the lawful exercise of parental rights."[3] *Id.* at 250 & n.5. So the court denied her motions.

_____

[3] The district court "added a description of kidnapping" to its § 875(b) instruction that it said it had pulled "largely" from the government's proposed instruction. Appellant's App. at 165:9–10. The government's proposed instruction listed as authority Tenth Circuit Criminal Pattern Jury Instructions Nos. 1.39 and 2.37 (2011). *See* United States' Proposed Jury Instructions at 8, *United States v. Mobley*, No. 17-10142-EFM, 2019 WL 1384294 (D. Kan. Mar. 27, 2019). Tenth Circuit Criminal Pattern Instruction No. 1.39 defines "interstate and foreign commerce," and Instruction No. 2.37 is the § 875(b) instruction. Neither of these instructions define the term "kidnap," let alone define it as the government proposed.

Then, about two months before Osipova's sentencing hearing, her mother sent the court an e-mail asking whether it had received a letter Osipova had sent it.[4] On March 29, 2019, the judge responded to the mother by e-mail as follows:

> I received the letter, but under our procedures really can only respond as the Court to matters filed on the record by her attorney.
>
> As you know, her sentencing is set for May 20. Her attorneys have been told several times that the sentencing will go very differently then depending on whether the children are back in the U.S. or not. But I hope everyone realizes that once sentencing is pronounced on that date, there is no authority to change or modify that sentence later, even if positive developments occur thereafter.

*Id.* at 255. On June 4, 2019, two days before her rescheduled sentencing hearing, Osipova moved for the judge's recusal under 28 U.S.C. § 455, arguing that this e-mail was an ex parte communication violating the Code of Conduct for U.S. Judges Canon 3(A)(4) and that it evinced the judge's extreme bias rendering him incapable of treating her fairly. The court denied the motion, concluding that the e-mail neither evinced bias nor was an

---

*See* Tenth Circuit Criminal Pattern Jury Instructions Nos. 1.39, 2.37. Only two circuits have defined "kidnap" in their § 875(b) pattern jury instructions and, notably, neither supports the district court's definition. *See* Fifth Circuit Criminal Pattern Instruction No. 2.39 (2019) ("For the definition of 'kidnap' see Note to Instruction No. 2.54 on 18 U.S.C. § 1201(a)."); *id.* No. 2.54 ("To 'kidnap' a person means to unlawfully hold, keep, detain, or confine the person against his [her] will and without his [her] consent. Involuntariness or coercion in connection with the victim's detention is an essential part of the offense." (brackets in original)); Eighth Circuit Criminal Pattern Instruction No. 6.18.875B (2017) ("A person is 'kidnapped' when [he][she] is [kept][confined][detained] without [his][her] consent and transported across a state line while [kept][confined][detained]." (brackets in original)).

[4] The record does not include Osipova's letter.

8

ex parte communication, and that, even if it were an ex parte communication, recusal would be unwarranted.

On June 6, the court sentenced Osipova—who had not secured the girls' return from Russia in the few weeks after the judge's warning to her mother that Osipova's sentencing "will go very differently" if the girls were not in the United States. The government requested that the court order Osipova to pay Mobley restitution under 18 U.S.C. § 3663 for his attorney's fees incurred in his unsuccessful attempt to bring the girls to the United States. Osipova objected, asserting that the court could not legally order restitution for these fees, because they were unrelated to the prosecution or the investigation of her offense. The court overruled her objection, concluding that the fees "are directly related to the offense of conviction," and awarded Mobley $18,100 in restitution for the fees. Appellee's Suppl. App. vol. I at 174:14–19.

The government also requested that the court sentence Osipova to 87 months' imprisonment—the high end of the U.S. Sentencing Guidelines Manual's advisory range of 70–87 months.[5] Osipova faced a statutory maximum of three years on her international-parental-kidnapping conviction and of twenty years on her extortionate-communications convictions. *See* 18 U.S.C. §§ 875(b), 1204(a). So she asked for a three-year sentence, arguing that anything beyond that is "overrepresentative" because "the conduct which constitutes the extortion counts are almost factually the

---

[5] At the beginning of the sentencing hearing, Osipova withdrew her objections to the Guidelines range, so the court adopted the probation officer's calculation contained in the presentence investigation report.

same as [the] kidnapping." Appellee's Suppl. App. vol. I at 222:22–223:1. The court

sentenced Osipova to three years on the international-parental-kidnapping count and

seven years on the extortionate-communication counts, all to run concurrently.

Osipova timely appealed.

## DISCUSSION

Osipova asserts that the district court erred in four ways: (1) by not dismissing

the indictment, (2) by sustaining her extortionate-communications convictions, (3) by

not recusing itself over the e-mail sent to her mother, and (4) by awarding Mobley

restitution for his attorney's fees. After identifying our standard of review for each

issue, we address the issues in turn.

## I.    Standards of Review

We generally review a district court's denial of a motion to dismiss an

indictment for an abuse of discretion. *See, e.g.*, *United States v. Stevens*, 881 F.3d

1249, 1252 (10th Cir. 2018) (quoting *United States v. Ambort*, 405 F.3d 1109, 1116

(10th Cir. 2005)). But "when the sufficiency of a charge is challenged, we review the

district court's decision de novo."[6] *Ambort*, 405 F.3d at 1116 (quoting *United States*

---

[6] Osipova asserts that the district court concluded that "a jury could find [her] messages to be true threats" under the First Amendment and refused to dismiss the indictment (a decision we would review de novo). Appellant's Opening Br. at 8. But the record belies this assertion. Osipova never raised a true-threat argument in the district court, and the court did not address the issue. She argued only that the indictment was not specific enough, and that is the issue the court decided—finding the indictment sufficient and so refusing to dismiss it. To the extent she means to raise a forfeited true-threat argument on appeal for the first time, she has waived it by failing to explain how it survives plain-error review. *See United States v. Garcia*, 936 F.3d 1128, 1131 (10th Cir. 2019) (stating that arguments not raised before the district

*v. Giles*, 213 F.3d 1247, 1248–49 (10th Cir. 2000)) (internal quotation marks omitted).

"We review the sufficiency of the evidence de novo to determine whether a rational jury could find the defendant guilty beyond a reasonable doubt." *United States v. Hammers*, 942 F.3d 1001, 1012 (10th Cir. 2019) (citation omitted). But to decide Osipova's sufficiency-of-the-evidence issue, we must first determine what constitutes a "threat to kidnap" under § 875(b), a question of statutory interpretation that we review de novo. *See United States v. Sturm*, 672 F.3d 891, 897 (10th Cir. 2012) (citation omitted).

We "review a district court's denial of a motion to recuse or disqualify a judge for abuse of discretion." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1308 (10th Cir. 2015) (citation omitted). "[A] court abuses its discretion only when it makes a clear error of judgment, exceeds the bounds of permissible choice, or when its decision is arbitrary, capricious or whimsical, or results in a manifestly unreasonable judgment." *Id.* at 1309 (alteration in original) (citation and internal quotation marks omitted).

"We review the legality of a restitution order *de novo*, which involves reviewing the underlying factual findings for clear error and the amount of restitution imposed for abuse of discretion." *United States v. Howard*, 887 F.3d 1072, 1077 (10th Cir. 2018) (quoting *United States v. Battles*, 745 F.3d 436, 460 (10th Cir.

---

court are forfeited and must meet our plain-error standard, but that failure to argue for plain error waives the issue (citations omitted)).

2014)) (internal quotation marks omitted). Osipova challenges the restitution order only as a matter of law, waiving any appellate challenge to the underlying factual findings or to the specific amount imposed (so we do not consider these issues). *See, e.g.*, *Burke v. Regalado*, 935 F.3d 960, 1014 (10th Cir. 2019) ("Issues not raised in the opening brief are deemed abandoned or waived." (citation and internal quotation marks omitted)).

## II.  The Indictment Is Sufficient.

Osipova asserts that the indictment is insufficient for not including "the essential facts of the offense, the means by which [she] allegedly committed the offense, or an assertion that those means were unknown to the Government[.]" Appellant's Opening Br. at 11. "We test the indictment solely on the basis of the allegations made on its face, and such allegations are to be taken as true." *Ambort*, 405 F.3d at 1116 (quoting *United States v. Reitmeyer*, 356 F.3d 1313, 1316–17 (10th Cir. 2004)) (internal quotation marks omitted). "[T]he question is not whether the government has presented sufficient evidence to support the charge, but solely whether the allegations in the indictment, if true, are sufficient to establish a violation of the charged offense."[7] *United States v. Todd*, 446 F.3d 1062, 1068 (10th Cir. 2006) (citations omitted).

We apply a two-part test to determine the indictment's sufficiency:

---

[7] In this Part, we are deciding only whether the indictment suffices under the government's definition of § 875(b)'s "threat to kidnap." We later decide whether the government has properly charged a crime with this definition. *See infra* Part III.

> "First, the indictment must contain the elements of the offense and sufficiently apprise the defendant of what [s]he must be prepared to meet; second, it must be such as to show to what extent [s]he may plead a former acquittal or conviction as a bar to further prosecution for the same cause."

*United States v. Wells*, 873 F.3d 1241, 1254 (10th Cir. 2017) (quoting *United States v. Berres*, 777 F.3d 1083, 1089 (10th Cir. 2015)). "[W]here the indictment quotes the language of a statute and includes the date, place, and nature of illegal activity, it 'need not go further and allege in detail the factual proof that will be relied upon to support the charges.'" *United States v. Redcorn*, 528 F.3d 727, 733 (10th Cir. 2008) (quoting *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988)).

Here, *Count 1* of the indictment alleges:

> On or about April 2, 2014, and continuing through the date of the filing of this Indictment, in the District of Kansas and elsewhere, the defendant . . . removed a child from the United States and retained a child outside the United States with intent to obstruct the lawful exercise of another's parental rights, in violation of Title 18, United States Code Section 1204.

Appellant's App. at 17. *Count 2* alleges:

> Between August 27 and August 30, 2015, as part of the continuing offense in Count 1, the defendant . . . transmitted in interstate and foreign commerce a communication containing a threat to kidnap, that is, to continue to retain a child outside the United States with the intent to obstruct the lawful exercise of another's parental rights, and the defendant did so with the intent to extort from any person any money or thing of value, in violation of Title 18, United States Code Section 875(b).

*Id.* at 18. *Counts 3 through 5* are identical to *Count 2* in their allegations except for the alleged date of the offense. *See id.* at 18–19 (count 3 charging "On or about November 21, 2015"), 19 (count 4 charging "On or about December 17, 2015"), 19–20 (count 5 charging "On or about December 5–6, 2016").

As Osipova concedes, the indictment includes the elements of the offenses charged. The first count's language is nearly identical to that of the international-parental-kidnapping statute. *See* 18 U.S.C. § 1204(a). Counts 2 through 5 track the extortionate-communications statute except for (erroneously, as later discussed) defining kidnap as "to continue to retain a child outside the United States with the intent to obstruct the lawful exercise of another's parental rights." *Compare* Appellant's App. at 18–20, *with* 18 U.S.C. § 875(b). The indictment "contains the date, place, and nature of the charged illegal activity. It is thus entirely sufficient to give [Osipova] fair notice and enable [her] to determine whether to raise a double jeopardy defense." *Redcorn*, 528 F.3d at 734. That is all the law requires. *See id.* Osipova's argument to the contrary is unavailing.

Osipova argues that the parental-kidnapping count lacks specificity because it excludes the name of the removed child, the means of removal (or that the means were unknown to the government), the location to which Osipova removed the child, the person whose parental rights she intended to obstruct, and the basis of that person's acquiring parental rights. Likewise, she argues that the extortionate-communications counts lack specificity because they exclude the location from which she sent the alleged threats, the location at which the alleged threats were received, the means of sending the alleged threats, the language of the alleged threats, the name of the retained child, the location at which she retained the child, the person to whom she sent the threats, the person whose rights she intended to obstruct, and the basis of that person's acquiring parental rights. Osipova's argument for more specificity, however, amounts to a request

for the facts that the government would rely on to support the charges. Our precedent is clear that the indictment is sufficient without such factual proof. *Redcorn*, 528 F.3d at 733 (citation omitted).

Moreover, Osipova has not claimed prejudice from any lack of specificity in the indictment. In fact, her counsel admitted at the motion hearing that "[t]here's litigation history which would put [Osipova] and her attorneys on notice what she's to defend." Appellee's Suppl. App. vol. I at 45:3–5. "[I]nadequacy of an indictment requires reversal only if it prejudiced the defendant." *United States v. Harrold*, 796 F.2d 1275, 1278 (10th Cir. 1986) (citation omitted); *see also United States v. Doe*, 572 F.3d 1162, 1175 (10th Cir. 2009) (applying harmless-error review). We thus affirm the district court's denial of Osipova's motion to dismiss the indictment.

## III.   Osipova's 18 U.S.C. § 875(b) Convictions Rest on an Erroneous Interpretation of the "Threat to Kidnap" Element.

Osipova asserts that the government failed to introduce sufficient evidence to sustain her extortionate-communication convictions—particularly that the government failed to prove that she made a threat to kidnap. She first argues that her messages to Mobley did not communicate a threat to continue to retain S.M. outside the United States,[8] because she never offered to return S.M. to the United States. This argument assumes, however, that the district court's definition of "kidnap" was

---

[8] The district court instructed the jury that under § 875(b), "[t]o 'kidnap' any person includes continuing to retain them outside of the United States with the intent to obstruct the lawful exercise of parental rights." Appellant's App. at 187:19–21.

correct, i.e., that § 875(b)'s use of "kidnap" encompasses the decades-later-enacted separate § 1204 crime of "international parental kidnapping."

But noting the exclusion of parental kidnapping from the federal kidnapping statute, 18 U.S.C. § 1201,[9] we questioned at oral argument whether § 875(b)'s "kidnap" is so malleable. We thus ordered supplemental briefing on that general question. In her supplemental brief, Osipova asserts that "applying the ordinary-meaning canon of statutory interpretation" to § 875(b)'s "kidnap" shows that it "does not include parental retention." Appellant's Suppl. Br. at 1. The government responds that "the plain language" of § 875(b) indicates otherwise, with no "exceptions or exclusions for certain perpetrators or victims."[10] Appellee Suppl. Resp. Br. at 1–2. But the government does not cite a single case involving a prosecution for a threat to kidnap under § 875(b) based on an "international parental kidnapping" under § 1204; a single case or pattern jury instruction using its definition of "kidnap" in a prosecution under § 875(b); or a single case involving a § 875(b) charge involving an

---

[9] Section 1201 applies to "[w]hoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, *except in the case of a minor by the parent thereof*, when" one of the various jurisdictional hooks is satisfied. (emphasis added).

[10] The government ignores that § 875(b) uses the undefined term "kidnap," which itself could contain exclusions. For example, the Sixth Circuit has concluded that a father could not be charged under § 875(c) (identical to § 875(b) except there is no intent-to-extort requirement) because he could not "legally be charged with kidnapping under state or federal law," meaning his threat to take his child was not a "threat to kidnap[.]" *United States v. Landham*, 251 F.3d 1072, 1081 (6th Cir. 2001).

16

intent to extort money based on a demand for child support or restoration of property

sold as part of a divorce proceeding. Nor have we found any.

Though Osipova did not challenge the district court's and government's

interpretation of § 875(b)'s "kidnap" until her supplemental brief, we nonetheless

review this interpretation. Osipova has asserted from the beginning that the

government could not and did not prove that she communicated any threat to kidnap

S.M. under the district court's and government's interpretation. *See, e.g.*, Appellant's

App. at 214:24–217:24 (closing argument), 240–42 (motion for judgment of

acquittal). And the government has contended that it could and did meet its burden to

show that Osipova communicated such a threat. *See, e.g.*, *id.* at 206:10–208:25

(closing statement); Br. for Appellee at 18–20. Thus, we have before us "a real case

and controversy extending" to the issue whether the government produced sufficient

evidence of § 875(b)'s "threat to kidnap" element[11] to uphold Osipova's convictions.

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993).

And "[w]hen an issue or claim is properly before the court, the court is not limited to

the particular legal theories advanced by the parties, but rather retains the

independent power to identify and apply the proper construction of governing law."

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991) (citing *Arcadia v. Ohio

Power Co.*, 498 U.S. 73, 77 (1990)). Here, the meaning of "kidnap" under § 875(b) is

---

[11] In conducting our sufficiency-of-the-evidence review, we must "determine whether a rational trier of fact could have found 'the essential elements of the crime beyond a reasonable doubt.'" *United States v. Winder*, 557 F.3d 1129, 1137 (10th Cir. 2009) (quoting *United States v. Bowen*, 527 F.3d 1065, 1076 (10th Cir. 2008)).

"an issue 'antecedent to . . . and ultimately dispositive of' the dispute before" us, so

we may consider it despite the parties' failure to address it until we ordered

supplemental briefing. *U.S. Nat'l Bank of Or.*, 508 U.S. at 447 (omission in original)

(quoting *Arcadia*, 498 U.S. at 77; and citing *Cardinal Chem. Co. v. Morton Int'l,

Inc.*, 508 U.S. 83, 88 n.9 (1993)).

So we turn to determining whether the word "kidnap" as used in § 875(b)

encompasses "international parental kidnapping" under § 1204. We begin our

analysis by examining the plain text of § 875(a)–(c), § 1201, and § 1204 to interpret

§ 875's "kidnap" "with a view to [its] place in the overall statutory scheme" and "in

light of the purposes Congress sought to serve." *Been v. O.K. Indus.*, 495 F.3d 1217,

1227 (10th Cir. 2007) (citations and internal quotation marks omitted). "[I]t's a

'fundamental canon of statutory construction' that words generally should be

'interpreted as taking their ordinary, contemporary, common meaning . . . at the time

Congress enacted the statute.'" *Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067,

2074 (2018) (omission in original) (quoting *Perrin v. United States*, 444 U.S. 37, 42

(1979)). But "where a federal criminal statute uses a common-law term of established

meaning without otherwise defining it, the general practice is to give that term its

common-law meaning," *Moskal v. United States*, 498 U.S. 103, 114 (1990)

(alteration, citation, and internal quotation marks omitted), unless Congress has

instructed us otherwise, *see Morissette v. United States*, 342 U.S. 246, 263 (1952).

"The plain meaning of legislation should be conclusive, except in the 'rare cases [in

which] the literal application of a statute will produce a result demonstrably at odds

with the intentions of its drafters.'" *United States v. Ron Pair Enters.*, 489 U.S. 235, 242 (1989) (alteration in original) (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982)).

We start with the language from the statute of the two disputed convictions:

(a) Whoever transmits in interstate or foreign commerce any communication containing any demand or request for a ransom or reward for the release of any kidnapped person, shall be fined under this title or imprisoned not more than twenty years, or both.

(b) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.

(c) Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 875(a)–(c).[12] The meaning of "kidnap" is not plain from this text alone. And Congress did not define "kidnap" in § 875 or in chapter 41, which houses § 875.

"Kidnap" had an established meaning at common law. It "meant to take and carry away any person by force and against his will." *United States v. Marx*, 485 F.2d 1179, 1186 (10th Cir. 1973); *see also United States v. Young*, 512 F.2d 321, 323 (4th Cir. 1975) ("[A]t common law 'kidnap' meant to take and carry a person by force and against his will."). So unless Congress has instructed otherwise, we ascribe that meaning to § 875's use of the term. *See, e.g.*, *Moskal*, 498 U.S. at 114; *Morissette*,

---

[12] We omit subsection (d) because it does not use the term "kidnap."

342 U.S. at 263. We now turn to the legislative history and § 875's role in the "overall statutory scheme" to determine if Congress has instructed otherwise.

### A.    The Common Heritage of §§ 875 and 1201

The following discussion shows that Congress enacted as companions the predecessors and present versions of § 875, the extortionate-communications statute, and § 1201, the federal kidnapping statute. To demonstrate this, we first examine the history of § 1201's and § 875's enactments. Then, we use this history to help us interpret the statutory language Congress used in § 875.

In 1932, Congress enacted 18 U.S.C. § 408a, the first statutory predecessor to § 1201, in response to the Lindbergh kidnapping.[13] *See* Act of June 22, 1932, ch. 271, 47 Stat. 326 (codified at 18 U.S.C. § 408a) (current version at 18 U.S.C. § 1201); *Chatwin v. United States*, 326 U.S. 455, 463 (1946). As the Supreme Court observed:

> Kidnaping by that time had become an epidemic in the United States. Ruthless criminal bands utilized every known legal and scientific means to achieve their aims and to protect themselves. Victims were selected from among the wealthy with great care and study. Details of the seizures and detentions were fully and meticulously worked out in advance. Ransom was the usual motive.

---

[13] On March 1, 1932, Charles Augustus Lindbergh Jr., the son of the famous aviator, was stolen from his crib in his second-floor bedroom. *See Lindbergh Kidnapping*, FBI, https://www.fbi.gov/history/famous-cases/lindbergh-kidnapping (last visited Aug. 3, 2020). A search of the scene revealed, among other clues, a $50,000-ransom note and a broken ladder. *Id.* Two months and twelve ransom notes later, the baby's body was found. *Id.* He apparently died the night he was kidnapped. *Id.*; *see also Kidnapping and Trial,* Minn. Historical Soc'y, https://www.mnhs.org/lindbergh/learn/kidnapping (last viewed Aug. 3, 2020).

*Chatwin*, 326 U.S. at 462–63. So Congress enacted the Lindbergh Act "to cover every possible variety of kidnaping followed by interstate transportation," *id.* at 463, and to provide a federal criminal remedy for the physical harm and violence involved in kidnapping for ransom, *see, e.g.*, *Amendments to the Federal Kidnaping Statute: Hearings on H.R. 4191 and H.R. 8722 Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 93d Cong. 13, 20–21 (1974) (discussing the legislative history of the Lindbergh Act).

The Act applied to "[w]hoever shall knowingly transport or cause to be transported, or aid or abet in transporting, in interstate or foreign commerce, any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnaped, abducted, or carried away by any means whatsoever and held for ransom or reward[.]" Act of June 22, 1932, ch. 271, 47 Stat. 326. This plain language leads us to two conclusions. First, that Congress adopted the common-law meaning of "kidnap" in using that single term in the Act. *See Morissette*, 342 U.S. at 263. This is because "kidnap" had an established meaning at common law and because Congress did not instruct us otherwise. *See id.* Moreover, the common-law meaning, "to take and carry away any person by force and against his will," does not render any of the other delineated means superfluous. *Marx*, 485 F.2d at 1186; *see also, e.g.*, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" (quoting *Duncan v. Walker*, 553 U.S. 167, 174 (2001))).

And second, though Congress used the common-law meaning of "kidnap" in the Act, its use of other culpable acts listed in § 408a's verb string criminalized much more than common-law "kidnap." *See* Act of June 22, 1932, ch. 271, 47 Stat. 326. Congress's delineation of alternative means of establishing a single element of the § 408a offense shows that Congress considered any one of these means to constitute, in a more general sense, a "kidnapped person." *See United States v. Gillis*, 938 F.3d 1181, 1204 (11th Cir. 2019) (determining that § 1201(a) provides "several methods of violating the statute [that] are all factual means of accomplishing 'kidnapping' rather than separate elements creating several distinct kidnapping offenses" (citations omitted)). This conclusion is plain from the text. But we gain further support from Congress's having titled § 408a "Kidnaped persons; transportation, etc., of persons unlawfully detained," 18 U.S.C. § 408a (1934) (bold removed); referring to it as "the kidnaping bill," 75 Cong. Rec. 13,282 (1932); and enacting it to enable the apprehension of kidnappers who take their victims across state lines, 75 Cong. Rec. 13,284 (1932). *See also* 78 Cong. Rec. 8,127 (1934) (referring to § 408a as "the act forbidding the transportation of kidnaped persons in interstate commerce"); *Chatwin*, 326 U.S. at 463 (recognizing that Congress used "[c]omprehensive language . . . to cover every possible variety of kidnaping followed by interstate transportation").

Though a prosecutor might have thought this first delineation of "kidnapped person" expansive enough to cover parental kidnappings, Congress's hinging the crime on being held for ransom or reward would have compromised that notion. *See United States v. Acevedo*, 824 F.3d 179, 185 (1st Cir. 2016) (noting that "a parent

abscond[ing] across state lines with his child in violation of a custody order" is a type of kidnapping "inherently unlikely to involve ransoms"); *United States v. Boettcher*, 780 F.2d 435, 436 (4th Cir. 1985) ("The obvious purpose of such restricted scope for that crime ('for reward or ransom') was to eliminate from the statute's coverage the kidnaping, conspiracy to kidnap or aiding and abetting in the kidnaping by a parent of his or her child."). Further, in the House debate over the Act, a Representative recognized this possibility: "I do not believe it is intended or desired to include punishment for kidnaping in cases where a mother or a father has taken a child away where there has been a divorce, or something of that kind. I hope an amendment providing for this will be included in the bill." 75 Cong. Rec. at 13,286 (1932). He remarked that the Act was meant "to provide the severest punishment for people who kidnap and carry off people from one State to another for ransom, for money." *Id.* at 13,296. He opined, "There is not anybody who would want to send a parent to the penitentiary for taking possession of his or her own child, even though the order of the court was violated and it was a technical kidnaping." *Id.*

In 1934, apparently to eliminate any possibility of such a prosecution, Congress amended the Act. After "and held for ransom or reward," Congress added an exclusion: "or otherwise, except, in the case of a minor, by a parent thereof[.]"[14]

---

[14] The House Committee on the Judiciary recommended adding this language, because it "will extend Federal jurisdiction under the act to persons who have been kidnaped and held, not only for reward, but for any other reason, except that a kidnaping by a parent of his child is specifically exempted." H.R. Rep. No. 1457, at 2 (1934).

Act of May 18, 1934, ch. 301, 48 Stat. 781 (codified at 18 U.S.C. § 408a (1934)

(current version at 18 U.S.C. § 1201[15]); *see also Gooch v. United States*, 297 U.S.

124, 129 (1936) (noting the exclusion "indicate[s] legislative understanding that,"

without it, "a parent, who carried his child away because of affection, might subject

himself to condemnation of the statute" (citation omitted)). That same day, Congress

enacted a new statute—the first statutory predecessor to § 875—applying to

> whoever, with intent to extort from any person, firm, association, or corporation any money or other thing of value, shall transmit in interstate commerce, by any means whatsoever, any threat (1) to injure the person, property, or reputation of any person, or (2) to kidnap any person, or (3) to accuse any person of a crime, or (4) containing any demand or request for a ransom or reward for the release of any kidnaped person[.]

Act of May 18, 1934, ch. 300, 48 Stat. 781 (codified at 18 U.S.C. § 408d (1934)) (current

version at 18 U.S.C. § 875).

The House considered and passed in succession both statutes on the same day.

*See* 78 Cong. Rec. 8,127–28 (1934). In fact, the House considered them "kindred

bills, known as the 'crime bills[.]'" *Id.* at 8,775 (discussing, among other bills,

S. 2252, "to amend the act forbidding the transportation of kidnaped persons in

interstate commerce," and S. 2249, the extortionate-communications bill). And

Congress designed § 408d "to bolster up the Patterson Act passed in 1932, which

makes it a Federal offense to transmit threats through the mail with intent to extort

---

[15] Congress amended § 1201 in 1993 to define "parent": "As used in this section, the term 'parent' does not include a person whose parental rights with respect to the victim of an offense under this section have been terminated by a final court order." Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, sec. 320924, 108 Stat. 1796, 2131 (codified at 18 U.S.C. § 1201(h)).

any money or other thing of value" and extended federal control "over kidnapers." *Id.* at 6,855. Congress's considering § 408d contemporaneously with the parental-kidnapping exclusion and designing § 408d as a companion to § 408a underscores that Congress intended § 408d's "kidnap" to match the broad concept of kidnapping it criminalized in § 408a. *See United States v. Jackson*, 180 F.3d 55, 70 (2d Cir.), *reh'g granted on other grounds*, 196 F.3d 383 (2d Cir. 1999) ("Given Congress's contemporaneous consideration of the predecessors of § 875(d) and the Hobbs Act, both of which focused on extortion, we infer that Congress's concept of extortion was the same with respect to both statutes."). Moreover, in 1948, when Congress revised Title 18 and moved § 408a to § 1201 and § 408d to § 875, Congress did not substantively change the statutes. *See* H.R. Rep. No. 152, at A67, A89–90 (1945). So, like § 408a and § 408d, § 1201 and § 875 are companions.

We thus conclude that Congress intended "kidnap" in § 875 to reference the broader definition of "kidnap"[16] it created in § 1201 and did not use the term in its

---

[16] Congress initially focused the Lindbergh Act on the transportation of a kidnap victim in interstate or foreign commerce. But in 1972, Congress amended the Act to make the kidnap itself the focus. *See Amendments to the Federal Kidnaping Statute: Hearings on H.R. 4191 and H.R. 8722 Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 93d Cong. 29 (1974). In considering this amendment, Congress recognized that the term "kidnap[] has acquired a general meaning sufficient to encompass the operative term 'seizes', 'confines', etc." *Id.* at 30 (quoting H. Rep. 92-1208, at 16 (1972)). But Congress nonetheless retained these operative terms. *Id.* These terms, combined with the intent "for ransom or reward or otherwise . . . , except in the case of a minor by the parent thereof," have triggered the "kidnap" element of the Lindbergh Act since 1934, regardless of the Act's focus. *See* 18 U.S.C. § 1201 (1972); 18 U.S.C. § 408a (1934); *see also Gillis*, 938 F.3d at 1203–04 (determining that this language provides several means of accomplishing "kidnapping").

strict, common-law sense.[17] As companion statutes, § 875 and § 1201 must work together and not hinder the other. Imputing only the common-law definition of "kidnap" to § 875 as we did to "kidnap" in § 1201's verb string would undermine the work Congress put into broadening the crime in § 1201. So, instead, § 875's "kidnap" must incorporate Congress's generalized "kidnap" set out in § 1201's verb string. And, as seen, the plain language and legislative history of § 1201 shows Congress's intent to exclude parents from federal criminal sanctions for kidnapping and for threatening to kidnap their children.[18] *See also Boettcher*, 780 F.2d at 437 (stating that, in enacting § 1201, "Congress never intended to expose parents kidnaping their own minor child to criminal sanctions"). The same must hold true for § 875's "kidnap."

---

[17] We note that even had Congress adopted the common-law definition, Osipova's messages would not have communicated a threat to kidnap, because she did not threaten to take S.M. against her will. When Osipova sent the messages, she had already taken S.M. to Russia and thus could not have threatened to take and carry away S.M. against S.M.'s will. Nor does anything indicate that Osipova could or did forcefully remove the fourteen-month-old S.M. to Russia.

[18] The government asserts that Congress's reference to § 1201 in 18 U.S.C. § 878 (another threat/extortion statute) and not in § 875 indicates Congress did not intend to include § 1201's parental-kidnapping exception in § 875. We see no such intent. Section 878 also references two other statutes to encompass those that, like § 1201, protect foreign officials, official guests, and internationally protected persons. These references easily delineate all the conduct Congress wanted § 878 to cover. Such references would not benefit the less-expansive § 875, especially because Congress enacted its predecessor as a companion to the Lindbergh Act.

**B.     Section 875 Does Not Incorporate § 1204's or the Government's Definitions of International Parental Kidnapping.**

In 1993, Congress passed the International Parental Kidnapping Crime Act of 1993, a statute meant "to deter the removal of children from the United States to foreign countries in order to obstruct parental rights." *See* H.R. Rep. 103-390, at 1 (1993). This statute created a new federal felony offense to work in tandem with the Hague Convention on International Parental Child Abduction and to make it easier for a left-behind parent to obtain the abducted child's return from countries that are not signatories to the Convention. *Id.* at 3. But it left the Convention as "the option of first choice." *Id.* at 5. The statute covers "[w]hoever removes a child from the United States, or attempts to do so, or retains a child (who has been in the United States) outside the United States with intent to obstruct the lawful exercise of parental rights[.]" § 1204(a).[19] This definition of "international parental kidnapping" (as the government expanded in the indictment to include "continuing to retain"[20]) is what the government seeks to transplant into § 875(b)'s "threat to kidnap" element. But, as shown in the last section, injecting the separate crime of "international parental kidnapping" into § 875(b)'s "kidnap" would unmoor the federal crime of kidnapping from its understood meaning since 1934 when Congress specifically excluded

---

[19] We note that, unlike § 1201, § 1204 uses the word "kidnap" only in its title, not in its text, though both statutes are in the kidnap portion of the Code.

[20] Section 1204 does not say "continue to retain." The government makes no attempt to justify its revision of the statute to produce its definition of "kidnap."

27

parental kidnapping.[21] *See supra* Section III.A. And incorporating § 1204(a)'s definition of "international parental kidnapping (let alone the government's expanded definition) into § 875(b)'s use of "kidnap" would lead to absurd results.

First, we read § 1204 as providing three means of accomplishing "international parental kidnapping" and not three elements, namely, the means of (1) removal, (2) attempted removal, and (3) retention. *See United States v. Nixon*, 901 F.3d 918, 921 (7th Cir. 2018) (agreeing with the district court's conclusion that "§ 1204(a) states multiple ways of committing a single crime").[22] At the start of the trial, Osipova's counsel admitted that Osipova had illegally removed S.M. to Russia. Appellant's App. at 75:12–16 ("The evidence in this case will show that on April the 2nd of 2014, [Osipova] took her and Mr. Mobley's minor child [S.M.] outside of the United States and retained the child outside of the United States, in Russia, where she is from, in violation of a court order."). Thus, as we explain next, the jury had no

---

[21] The government asserts that we should not "disturb [our] previous conclusion that the common usage of 'kidnapping' would encompass the taking of children without the consent of the other parent." Appellee Suppl. Resp. Br. at 9 (citing *Anderson v. Cramlet*, 789 F.2d 840, 844 (10th Cir. 1986)). But it cites *Anderson*, a defamation case that examined the plain (not the legal) meaning of "kidnapping" and acknowledged that the term has "assumed a non-legal connotation" "in the area of child custody[.]" 789 F.2d at 844. We thus do not find *Anderson* illuminating for interpreting the meaning of § 875(b)'s "kidnap." And even if we adopted *Anderson*'s definition of kidnap for § 875(b)'s purposes, we would still vacate Osipova's § 875(b) convictions because her messages did not threaten to take S.M. without Mobley's consent—she already had S.M. when she sent the messages. *See id.*

[22] In reaching the conclusion that § 1204(a) provides three means of a single crime, Judge Easterbrook followed the Supreme Court's framework given in *Mathis v. United States*, 136 S. Ct. 2243 (2016).

reason to consider whether Osipova had violated § 1204(a) by a second means, that is, by unlawfully retaining S.M. in Russia.

We interpret the retention means of the international-parental-kidnapping offense as mapping "retention" as used in the Hague Convention, which applies when a parent holds the child beyond the time the left-behind parent was legally entitled to the child's return. *See, e.g.*, *de Silva v. Pitts*, 481 F.3d 1279, 1282, 1285 (10th Cir. 2007) (Hague Convention case analyzing a father's retention of his son past the agreed-to summer visit); Elisa Pérez-Vera, *Explanatory Report*, *in* 3 Acts and Documents of the Fourteenth Session, Child Abduction 426, 458–59 ¶ 108 (1980) (stating that the time limit begins to run in retention cases on the date "on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to an extension of the child's stay"). Thus, the "retains a child" means of international-parental-kidnapping is not in play when the parties agree that a parent has unlawfully removed a child from the United States.

Second, kidnapping is a unitary crime that continues until the victim is free. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999). It makes no sense to treat a "threat *to* kidnap," which implies that the kidnapping has not yet occurred, as a "threat *to continue* to retain," which means the kidnapping has happened and is ongoing. So the government's definition is at odds with § 875(b)'s plain language. An ongoing kidnapping, even one under § 1201, fits only under § 875(a).

Third, if we accepted the government's definition of § 875(b) "kidnap" as "continuing to retain [a person] outside of the United States with the intent to

29

obstruct the lawful exercise of parental rights," Appellant's App. at 187:19–21, we would render § 875(a) superfluous, at least in this instance. As noted, § 875(a) covers communications that contain "any demand or request for a ransom or reward for the release of any kidnapped person[.]" If a threat to continue to retain one's child absent receiving extorted money fits under § 875(b), then why have § 875(a)?[23] We should avoid reading a statute in a way that would render Congress's language superfluous. *E.g.*, *TRW Inc.*, 534 U.S. at 31.

Finally, the statutes' disparate penalties underscore the absurdity in adopting the government's definition of "kidnap." Section 875(b) provides that the defendant "shall be fined" or "imprisoned not more than twenty years, or both." This makes sense when read together with § 1201, which for completed kidnappings provides a more severe penalty. *See* § 1201 (providing for "imprisonment for any term of years or for life"). But this proportionality is lost when the government seeks to apply § 875(b) to § 1204, which caps any term of imprisonment at three years. We see no merit in the government's position that Congress capped imprisonment for a parental kidnapping at three years but provided a twenty-year maximum under § 875(b) for merely threatening to commit that offense. This absurdity strengthens our conclusion

---

[23] Obviously, the government could not prosecute under subsection (a), because no one could sensibly consider Osipova's requests for child support for S.M. as a ransom for her release. But the unavailability of subsection (a) does not make subsection (b) available. As discussed, subsection (b) concerns threats *to* kidnap. We reject the government's attempt to morph subsection (b) into something it is not—a hybrid of a threat to kidnap someone already kidnapped.

that Congress intended to exclude parental kidnapping from § 875(b)'s "threat to kidnap."

We thus conclude the government obtained the § 875(b) convictions against Osipova by using an invalid definition of "kidnap." Because Osipova could not legally be charged for kidnapping under § 1201, the threat-to-kidnap element of § 875(b) is not met. Osipova's convictions on counts 2 and 3 cannot stand; we vacate these convictions and remand for resentencing on count 1.

## IV.    The Court's E-Mail to Osipova's Mother Does Not Require Recusal.

Osipova argues that the district judge's e-mail to her mother required his recusal, because it was an ex parte communication violating the Judicial Code of Conduct and evinced his bias against Osipova. The government contends that Osipova has waived this argument, because she invited any error by "repeatedly [seeking] to engage the trial court in *ex parte* communications." Br. for Appellee at 24. We need not resolve the waiver issue, however, because Osipova's disqualification argument fails on the merits. Further, "[w]e believe that it is especially appropriate to reach the merits of this issue because recusal-based arguments uniquely implicate the integrity of the justice system." *Wells*, 873 F.3d at 1250 (citation omitted). We thus exercise our discretion to bypass the waiver issue and reach the merits of Osipova's argument for recusal.

Osipova moved for recusal under 28 U.S.C. § 455, which requires that a judge recuse from "any proceeding in which his impartiality might reasonably be questioned" or "[w]here he has a personal bias or prejudice concerning a party."

28 U.S.C. § 455(a), (b)(1). "Section 455 establishes 'an objective standard: disqualification is appropriate only where the reasonable person, were he to know all the circumstances, would harbor doubts about the judge's impartiality.'" *Wells*, 873 F.3d at 1251 (quoting *Mathis*, 787 F.3d at 1310). "'In conducting this review, we must ask how these facts would appear to a well-informed, thoughtful and objective observer,' who is 'an average member of the public,' not a 'hypersensitive, cynical, and suspicious person.'" *Id.* (quoting *Mathis*, 787 F.3d at 1310). Though judges "have a strong duty to recuse when appropriate," they also have "a strong duty to sit," and § 455 must not be so broadly construed as to make recusal mandated "upon the merest unsubstantiated suggestion of personal bias or prejudice." *Id.* (citation and internal quotation mark omitted).

The judge here did not exercise his best judgment in e-mailing Osipova's mother that her daughter's sentence would depend on whether the two girls were back in the United States before the sentencing hearing. But considering the mother's previous, numerous communications to the judge and the e-mail's content, an objective observer would likely not reasonably question the judge's impartiality. The e-mail communicated four things: (1) the judge had received Osipova's letter about which her mother had inquired, (2) the date set for sentencing, (3) an inference that the girls' return would lighten Osipova's sentence, and (4) the judge could not modify Osipova's sentence after he imposed it. Contrary to Osipova's assertions, this e-mail did not show that the judge had determined a specific sentence. The e-mail also did not communicate any information that Osipova did not already know. So the

e-mail provides no reasonable basis for questioning the judge's impartiality. We thus affirm the court's denial of Osipova's motion to disqualify.

## V.   Mobley's Attorney's Fees Are Not Recoverable in Restitution.

Finally, Osipova argues that Mobley's attorney's fees were not related to the government's investigation or prosecution and, thus, were not recoverable under 18 U.S.C. § 3663. Section 3663 authorizes a district court to order that the defendant make restitution to any victim of her offense. *See* § 3663(a)(1)(A). The order may, "in any case, reimburse the victim for lost income and necessary child care, transportation, and other expenses related to participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense[.]" § 3663(b)(4).

Here, the district court awarded Mobley $18,100 in restitution for attorney's fees incurred in "his efforts to retrieve the children from Russia, which were substantially frustrated by the defendant's establishment (after her arrest) of a guardianship in Russia."[24] Br. for Appellee at 33. The court concluded that these fees "are directly related to the offense of conviction." Appellee's Suppl. App. vol. I at 174:16–17. And the government maintains that the fees "were directly related to the defendant's criminal conduct and continuing obstruction" in using "the Russian courts to thwart repatriation of the children." Br. for Appellee at 34.

---

[24] Osipova does not dispute how Mobley incurred these attorney's fees.

But § 3663 does not authorize restitution for all expenses incurred by a victim that are "directly related to" the defendant's offense. Section 3663 delineates specific authorizations for restitution orders and the one relied on here, subsection (b)(4), is not met by expenses that are merely "related to" the offense. More is required: the expenses must be "related to *participation in* the investigation or prosecution of the offense or *attendance at* proceedings related to the offense[.]" § 3663(b)(4) (emphasis added). The terms "investigation," "prosecution," and "proceedings" are limited to the government's investigation, the government's criminal prosecution, and criminal proceedings. *Lagos v. United States*, 138 S. Ct. 1684, 1688 (2018).[25] And, to qualify for restitution, the expenses must be "caused by the specific conduct

---

[25] *Lagos* interpreted the meaning of these terms as used in 18 U.S.C. § 3663A(b)(4), which requires reimbursement "for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." Though § 3663(b)(4) is discretionary and uses "related to" where the mandatory § 3663A(b)(4) uses "incurred during," the Court's textual analysis of § 3663A(b)(4) in *Lagos* applies equally to § 3663(b)(4). The Court concluded "investigation" refers to government investigations because the word "is directly linked by the word 'or' to the word 'prosecution,' with which it shares the article 'the'"—a linkage that is also present in § 3663(b)(4). 138 S. Ct. at 1688; *see* § 3663(b)(4) ("the investigation or prosecution"). The Court applied "[a] similar line of reasoning" to conclude "that the immediately following reference to 'proceedings' also refers to criminal proceedings in particular," reasoning that also applies to § 3663(b)(4)'s identical language. 138 S. Ct. at 1688; *see* § 3663(b)(4) ("or attendance at proceedings"). Moreover, the same awkwardness the Court found in interpreting "'participation' to refer to a victim's role in its own private investigation, and the word 'attendance' to refer to a victim's role as a party in noncriminal court proceedings" applies equally to § 3663(b)(4). 138 S. Ct. at 1688; *see* § 3663(b)(4) (also using "participation in the investigation" and "attendance at proceedings").

that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990).

The attorney's fees that Mobley incurred do not satisfy § 3663(b)(4)'s requirements. The government has presented no evidence that Mobley's attorney's fees were related to his participation in its investigation or prosecution of Osipova. Instead, the government contends that the fees were the result of Mobley's attempt to bring his daughters back to the United States. There is no evidence that the government directed or sanctioned this action. In fact, the government admitted at oral argument that it never asked Mobley to incur these fees and that it was engaged with the Department of State in its own attempt to secure the girls' return. Moreover, the girls' return had no impact on the government's investigation or prosecution of Osipova.[26] Making the girls "whole" by reuniting them with a father they would consider a stranger was in no way "part and parcel" to the criminal prosecution, as the government contends. Oral Arg. at 30:26–55. So Mobley's attempt to secure the

---

[26] The government states that Mobley's attorney's fees "were incurred 'during participation in the . . . prosecution of the offense'" because "[l]ocating and (hopefully) retrieving the children was a central part of the government's investigation and prosecution effort." Br. for Appellee at 36 (omission in original). But Mobley already knew where the girls were—Russia—so he did not need to incur attorney's fees to locate them. Further, the girls' return to the United States was not necessary for the prosecution to proceed, so the government's assertion that their return was "central" to its effort is questionable. Finally, that the statute allows for childcare expenses incurred during participation in the investigation or prosecution of the offense but not Mobley's attorney's fees does not "make no sense" or "discredit the judicial system," because the latter fees were not incurred during such participation as required by the statute (while the former would be). *Id.* at 37; *see* § 3663(b)(4).

return of his daughters did not assist the government in its investigation or prosecution of Osipova. This means Mobley's attorney's fees are not recoverable under subsection (b)(4).

Moreover, Mobley's loss caused by Osipova's conduct underlying her conviction was the loss of his daughters. Mobley incurred attorney's fees only to try to recover his loss, i.e., obtain the return of his daughters. In *United States v. Diamond*, 969 F.2d 961, 968 (10th Cir. 1992), we opined that "[i]n the absence of specific statutory authority for an award of attorney's fees and expenses, we believe *Hughey* is decisive as it limits the substantive boundaries of restitution under the [statute] to the specific conduct underlying the offense of conviction." (citing *Hughey*, 495 U.S. at 413). "Expenses generated in recovering a victim's losses, therefore, generally are too far removed from the underlying criminal conduct to form the basis of a restitution order." *Id.* In *United States v. Patty*, 992 F.2d 1045, 1049 (10th Cir. 1993), we "construe[d] *Diamond* as holding that attorney fees incurred by the victim to recover his property are not directly related to the defendant's criminal conduct and thus are not recoverable in restitution." (citation omitted). But we recognized that "[t]here may be a situation . . . where attorney fees under the [Victim Witness Protection Act] are directly related to a defendant's criminal conduct because they were 'sustained by [the] victim as a result of the offense.'" *Id.* (third alteration in original) (quoting 18 U.S.C. § 3664). Though we decided *Diamond* and *Patty* before Congress enacted subsection (b)(4) in 1994, we

still find their logic applicable here, where § 3664(b)(4) does not expressly authorize granting Mobley restitution for his attorney's fees.

The government asserts § 3664(b)(4) does authorize restitution for Mobley's attorney's fees and for support cites an international-parental-kidnapping case that allowed similar fees, *United States v. Cummings*, 281 F.3d 1046 (9th Cir. 2002). In *Cummings*, the Ninth Circuit allowed restitution for attorney's fees incurred in the left-behind mother's attempt to recover custody of her children, concluding that the "attorney's fees are expenses related to the government's investigation and prosecution of Cummings for wrongfully retaining his children in a foreign country, thereby interfering with their mother's parental rights." 281 F.3d at 1052. The court determined that, under its precedent, the "incurred attorney's fees are [not] 'wholly separate' from the government's prosecution of Cummings." *Id.* at 1053.

But as discussed, § 3663(b)(4) requires participation in the prosecution, not merely a relationship to it. So while we agree that the girls' return is related to the international-parental-kidnapping offense, we do not see how seeking their return equates to participation in the investigation or prosecution of the offense. The government already knew the girls were in Russia and did not need to return them to Mobley's custody to obtain a conviction against Osipova. So, with no evidence that Mobley's attorney's fees were "related to participation in the investigation or prosecution of the offense," § 3663(b)(4), we decline to reach the same conclusion as the Ninth Circuit's in *Cummings*. We thus conclude that the district court's restitution order was unauthorized by law and must be vacated.

## CONCLUSION

For the foregoing reasons, we vacate Osipova's 18 U.S.C. § 875(b) convictions and the restitution order and remand for resentencing. We otherwise affirm.

19-3122, *United States v. Mobley*
**HOLMES**, J., Concurring.

In all material respects, I agree with the outcome and reasoning of the majority's opinion, except for Part III, which addresses the sufficiency of the evidence with respect to Ms. Osipova's convictions under 18 U.S.C. § 875(b). As to that part, I concur in the judgment only. Thus, like the majority, I believe that Ms. Osipova's § 875(b) convictions—that is, her convictions on counts 2 and 3 of the superseding indictment— must be vacated. In summary fashion, I explain my reasoning below.

"[W]e must decide whether there was sufficient evidence presented at trial for a reasonable jury, *properly instructed*, to have found beyond a reasonable doubt" that Ms. Osipova was guilty of the two § 875(b) offenses. *United States v. Wyatt*, 964 F.3d 947, 951 (10th Cir. 2020) (emphasis added). Therefore, our court is not bound by the jury instructions actually given at trial in resolving a properly preserved sufficiency-of-the-evidence challenge. Ms. Osipova properly preserved such a challenge. That said, in adhering to the well-settled principle of party presentation, it is neither required nor advisable for our court to *sua sponte* adjudicate independently questions pertaining to the proper governing law, in every instance where it is confronted with a sufficiency-of-the-evidence challenge. *See, e.g.*, *Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present."); *United States v. Tee*, 881 F.3d 1258, 1269 (10th Cir. 2018) ("We ordinarily

consider only the grounds presented by the appellant, wary of searching out our own reasons to reverse when the ground is not presented by the appellant[.]").  The parties' briefing must reveal a real controversy concerning the governing law.  And, though it only emerged through the parties' supplemental briefing, such a controversy is present here.

With respect to that controversy, I cannot agree with the majority's determination that the term "kidnap" in § 875(b) incorporates the conduct proscribed by the federal kidnapping statute, 18 U.S.C. § 1201—and, more specifically, incorporates the parental-kidnapping exclusion of that statute.  The plain terms of § 875(b) don't say that.  And the majority's wide-sweeping discussion of the statutory and legislative history of §§ 875(b) and 1201 does not persuasively indicate that Congress intended such an incorporation.  *See generally Thomas v. Reeves*, 961 F.3d 800, 817 n.45 (5th Cir. 2020) (en banc) (Willett, J., concurring) (per curiam) (discussing "the important distinction" between the concepts of "statutory" and "legislative" history).  I would give the term "kidnap" as used in § 875(b) its common-law meaning.  *See, e.g.*, *Moskal v. United States*, 498 U.S. 103, 114 (1990) ("[W]here a federal criminal statute uses a common-law term of established meaning without otherwise defining it, the general practice is to give that term its common-law meaning." (quoting *United States v. Turley,* 352 U.S. 407, 411 (1957))).  And we have stated what that meaning is: "[u]nder common law[,] 'kidnap' meant to take and carry away any person by force and against his will."  *United States v. Marx*, 485 F.2d 1179, 1186 (10th Cir. 1973); *accord United States v. Young*, 512 F.2d 321, 323 (4th Cir. 1975).  As the majority adverts to in footnote 17 of its opinion, when one applies the

2

common-law definition of "kidnap," no reasonable jury could determine—with respect to counts 2 and 3—that Ms. Osipova was guilty of transmitting threats to kidnap in violation of § 875(b).  Accordingly, her convictions for those counts should be **vacated** and her case should be **remanded** to the district court for further proceedings.

On the foregoing basis, I concur.